UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROY HAHN, et al., | Case No. 18-cv-05629-JSC |
| Plaintiffs, | |
| v. | **ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| SELECT PORTFOLIO SERVICING, INC., | **RE: DKT. NO. 52** |
| Defendant. | |

Roy Hahn, Linda Montgomery, and The Roy E. Hahn and Linda G. Montgomery Living Trust (the "Trust") (collectively, "Plaintiffs") sue Select Portfolio Servicing, Inc. ("SPS" or "Defendant") for alleged violations of federal and state laws arising out of Defendant's processing of Plaintiffs' loan modification applications.[1] Defendant's motion for summary judgment, or in the alternative, partial summary judgment is pending before the Court. (Dkt. No. 52.)[2] After careful consideration of the parties' briefing and having had the benefit of oral argument on December 19, 2019, the Court GRANTS Defendant's motion.

## BACKGROUND

The gravamen of Plaintiffs' First Amended Complaint is that SPS's failure to properly consider Plaintiffs' loan modification applications (also known as loss mitigation applications) resulted in SPS filing an "illegal" Notice of Trustee's Sale, forcing Plaintiffs to sell their home to avoid foreclosure.

//

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 11 & 12.)

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

I. **Factual Background**

    A.     **Plaintiffs' Mortgage and Default**

Mr. Hahn and Ms. Montgomery are husband and wife. (Dkt. No. 62-1 at ¶ 2.) At all times relevant to this action they were self-employed accounting professionals. (*See* Dkt. Nos. 54-1, Ex. 9 at 4:4-5:2 & 54-2, Ex. 10 at 3:17-24.) In August 2001, they purchased a condominium located at 765 Market Street, Unit 34-F, San Francisco, CA 94103 (the "Residence"), in a building known to the public as the Four Seasons Residences. (*Id.*; *see also* Dkt. No. 64, Ex. 1 at 2.) The purchase price was $2,650,000. (Dkt. No. 64, Ex. 1 at 2.) Mr. Hahn and Ms. Montgomery "together owned the Residence," and "held title to the Residence under the terms of [the Trust]." (Dkt. No. 62-1 at ¶ 2.)

In September 2005, Plaintiffs executed a 30-year mortgage loan (the "Note") with Washington Mutual Bank, FA ("Washington Mutual") in the amount of $2,450,000. (Dkt. No. 65, Ex. 17.) The Note was secured by a Deed of Trust (the "Deed") on the Residence. (*Id.*, Ex. 19.) JP Morgan Chase Bank ("Chase") subsequently acquired the Note after Chase acquired Washington Mutual around 2008. (*See* Dkt. No. 1-2, Ex. A at 25 ¶ 4.)

In January 2012, the IRS notified Mr. Hahn that it had assessed approximately $9,000,000 in penalties against him for "failure to register a tax shelter" related to an investment program he "designed and offered" to clients in 2001. (*See* Dkt. No. 1-2, Ex. A at 52 ¶ 84; *see also* Dkt. Nos. 54-1, Ex. 9 at 8:6-19 & 64, Ex. 8 at 91.) The IRS placed immediate liens on the Residence. (Dkt. No. 1-2, Ex. A at 52 ¶ 86; *see also* Dkt. Nos. 54-1, Ex. 9 at 7:19-25 & 64, Ex. 9.) The liens negatively affected Mr. Hahn's employment as investment manager by "prevent[ing] potential institutional investors from considering" retaining him. (Dkt. No. 1-2, Ex. A at 52 ¶¶ 84-86.) Further, Plaintiffs incurred "significant" legal fees in defending against the IRS assessment. (*Id.* at ¶ 84.) As a result, Plaintiffs "began to suffer severe financial distress in December 2013," primarily due to the IRS assessment against Mr. Hahn and resulting liens on the Residence. (*Id.*; *see also* Dkt. No. 54-1, Ex. 9 at 7:19-20 (testifying that "After [the effects of the global financial crisis in 2008], the Internal Revenue Service matters were the primary problem.").)

Plaintiffs defaulted on the Note around December 2013. (Dkt. No. 54-1, Ex. 9 at 6:17-19.)

In January 2014, Chase sent correspondence to Plaintiffs regarding the default and notifying Plaintiffs that they may be eligible for "mortgage assistance options." (Dkt. No. 65, Ex. 21 at 67.) Chase instructed Plaintiffs to complete and return an enclosed "Request for Mortgage Assistance Form" and send financial documents to Chase to determine eligibility. (*Id.*)

### B. Plaintiffs' Loss Mitigation Applications

In February 2014, Plaintiffs submitted the mortgage assistance form and financial documents to Chase. (Dkt. No. 65, Ex. 26.) By letter dated March 4, 2014, SPS notified Plaintiffs that servicing of the Note was transferred from Chase to SPS effective March 1, 2014. (Dkt. No. 65, Ex. 27.) SPS and Plaintiffs thereafter engaged in a year of back and forth correspondence. SPS continually asserted that certain necessary information was missing and thus the loss mitigation application was not complete, and Plaintiffs repeatedly responded that they had already provided the information on multiple occasions and that the application was complete. Plaintiffs also sometimes provided additional information. (*See, e.g.,* Dkt. Nos. 56-4, Ex. D; 56-5, Ex. E; 56-6, Ex. F; 56-7, Ex. G; 56-8, Ex. H; 66, Exs. 28, 32, 34-36, 38-40, 43, 45, 47, 49.)

### 1. The March 2015 Complete Loss Mitigation Application

On March 12, 2015 SPS finally advised Plaintiffs by letter that it "ha[d] received a complete Assistance Review Application, including all required information and documentation required to evaluate your account for loss mitigation assistance." (Dkt. No. 56-9, Ex. I at 2.) SPS's letter further states, in pertinent part: "We will evaluate your complete application for all loss mitigation options available to you and the results will be sent to you within thirty (30) days of this letter." (*Id.*) The letter also advised that SPS "may order" an appraisal in connection with its loss mitigation review. (*Id.*)

SPS's "Contact History Report" for Plaintiffs' account ("Account Report") includes an entry dated March 30, 2015, noting that an appraisal is needed to proceed with the loss mitigation review, but that attempts to gain access to the Residence had failed. (Dkt. No. 56-1, Ex. A at 63.) On April 7, 2015, SPS sent Plaintiffs a letter stating, in pertinent part: "[SPS] received your request for loss mitigation assistance, but due to your request or inactivity, we consider the assistance request withdrawn" because "[a]fter initially asking to be considered for assistance, you

3

withdrew that request on 04/06/2015." (Dkt. No. 56-10, Ex. J at 2.)  Mr. Hahn responded by fax on April 12, 2015, disputing that Plaintiffs withdrew their loan mitigation and stating, in pertinent part: "Show me the purported letter from me that asks for a withdrawal!"  (Dkt. No. 66, Ex. 54 at 98.)

On June 29, 2015, SPS sent a letter to Plaintiffs notifying them that the Residence was "close to being referred to foreclosure," that they were in default of the Note in the amount of $347,898.83, and that the last payment had been received on November 15, 2013.  (Dkt. No. 66, Ex. 55 at 100.)  The letter further states, in pertinent part: "We have been unable to contact you to consider you for a loan modification." (*Id.* at 101.)  The next day, SPS sent Plaintiffs an "Assistance Review Application" letter identifying the "Required Information" necessary for loss mitigation assistance review.  (Dkt. No. 66, Ex. 57 at 109.)

### 2.  Plaintiffs' Continued Loss Mitigation Efforts

Mr. Hahn responded to SPS's June 29 letter by fax on July 11, 2015, stating, in pertinent part:

> [Y]ou have continually failed to respond to the multitude of respon[ses] and information I have furnished to you at your request. Instead I received form letters asserting my formal withdrawal of an application (plainly untrue) and my failure to communicate with you (blatantly untrue given my written responses all of which you refuse to acknowledge).  I again request that you review the information I have previously furnished.

(Dkt. No. 66, Ex. 56 at 106.)  On July 17, 2015, SPS sent a Required Information Notice requesting the same federal tax information it had previously requested, as well as a "Hardship Affidavit."  (Dkt. No. 56-11, Ex. K at 2-3.)  Mr. Hahn responded by fax on August 1, 2015, referencing SPS's letters, Mr. Hahn's July 11 fax, and stating, in pertinent part: "Having now submitted multiple requests for loan modifications and provided every single document requested, timely and completely, I am unable to understand why my prior requests have been ignored." (Dkt. No. 66, Ex. 57 at 108.)  Mr. Hahn's fax further "incorporate[d] all prior responses to SPS," and "again request[ed] a loan modification."  (*Id.*)

The following month SPS responded to Mr. Hahn's August 1 fax, noting that "review initiated on March 13, 2014 remains closed" but stating that "a new Loss Mitigation Review was

initiated on July 16, 2015." (Dkt. No. 66, Ex. 58 at 116.)  The letter further states, in pertinent

part: "In order for us to complete the review for loss mitigation assistance you are first required to

submit a complete loss mitigation application."  (*Id.*)  The letter lists the specific "required

documentation," and asks Plaintiffs to provide it "as soon as possible."  (*Id.*)

Plaintiffs filed a complaint against SPS with the Consumer Financial Protection Bureau

("Consumer Bureau") on October 6, 2015, asserting that SPS had failed to process Plaintiffs'

"complete and timely" loss mitigation application.  (Dkt. No. 66, Ex. 59 at 121.)  The Consumer

Bureau forwarded the complaint to SPS.  (*Id.*)  The same day Plaintiffs filed their Consumer

Bureau complaint, Mr. Hahn responded by fax to SPS's September 15 letter, disputing the closure

of Plaintiffs' initial loss mitigation application.  (Dkt. No. 66, Ex. 60 at 127.)

On October 14, 2015, SPS responded to Mr. Hahn's October 6 fax, explaining that SPS

closed the initial loss mitigation application because SPS was unable to contact Plaintiffs to

"obtain access to the property to complete the [walk-through] BPO."  (Dkt. No. 66, Ex. 61 at 129.)

The letter further states, in pertinent part:

> We do not send out a letter requesting to gain access to the property ,
> but we attempt to reach you by phone, which was unsuccessful.  Since
> we began servicing your account, we have had phone contact with
> you only one time, which was on March 24, 2014.
>
> On July 13, 2015, SPS received documentation and on July 16, 2015,
> SPS submitted your account for a review of all foreclosure prevention
> options.  A walk-through BPO will be required to complete this
> review also.  The phone numbers that we have for you are (415) 371-
> 9541 and (415) 957-9396.  If these numbers are incorrect, please
> contact us so we may update our records.  We have not received the
> required documentation to complete our current review.

(*Id.*)  The letter lists the required documentation.  (*See id.*)

On November 4, 2015, National Default Servicing Corporation ("National Default") sent

Plaintiffs a letter notifying them that National Default had "been retained to conduct a non-judicial

foreclosure sale (trustee's sale) pursuant to the Deed."  (Dkt. No. 66, Ex. 63 at 134-137.)  SPS sent

Plaintiffs a letter the following day, notifying them that the SPS had referred Plaintiffs' mortgage

for legal action.  (*Id.* at 138.)  The letter informed Plaintiffs that they could submit a loan

mitigation application to possibly avoid foreclosure.  (*Id.*)

### 3. The July 2016 Complete Loss Mitigation Application

On November 8, 2015, Plaintiffs again applied for loss mitigation assistance review. (Dkt. No. 66, Exs. 62 & 64.) SPS and Plaintiffs thereafter engaged in frequent correspondence similar to that done in connection with the prior loss mitigation application: SPS repeatedly asked for specific information, Plaintiffs repeatedly responded that they had already provided such information, and occasionally Plaintiffs provided SPS with additional information. (*See, e.g.,* Dkt. No. 67, Exs. 70-81, 86-96.)

By letter dated July 29, 2016, SPS notified Plaintiffs that it had "received a complete Assistance Review Application, including all required information and documentation necessary to evaluate [Plaintiffs'] account for loss mitigation assistance." (Dkt. No. 56-22, Ex. V at 2.) SPS engaged RRReview to conduct an appraisal of the Residence, (Dkt. No. 56 at ¶ 29) and on August 1, 2016, RRReview in turn contacted Gurami Bantsadze, a licensed real estate appraiser, to inspect the Residence. (Dkt. No. 53 at ¶¶ 1, 5.) Mr. Bantsadze accepted the assignment and RRReview issued him a letter of engagement on August 3, 2016, listing Mr. Hahn as the point of contact for "interior access" and providing Mr. Hahn's daytime phone number. (Dkt. No. 53-2, Ex. 2.)

RRReview emailed Mr. Bantsadze five days later to check on the status of the inspection. (Dkt. No. 53-3, Ex 3 at 4.) Mr. Bantsadze responded that he had "[l]eft a message" and "need[ed] additional contact information." (*Id.* at 3.) On August 9, 2016, RRReview emailed Mr. Bantsadze stating that it had "placed th[e] order on hold for access" and notified SPS that Plaintiffs were not responding. (*Id.* at 2.)

The next day, RRReview emailed Mr. Bantsadze with a "new number" to contact Mr. Hahn. (Dkt. No. 53-4, Ex. 4 at 2.) RRReview also emailed Mr. Bantsadze a new engagement letter that again listed Mr. Hahn as the "contact for interior access," but also listed the new number as Mr. Hahn's "evening phone." (*See* Dkt. No. 53-5, Ex. 5 at 3.) On August 11, 2016, Mr. Bantsadze emailed RRReview, stating that he had "[l]eft repeated messages on multiple days on both numbers you have prov[ided], and waiting for [Mr. Hahn's] call back." (Dkt. No. 53-6, Ex. 6.) RRReview emailed Mr. Bantsadze five days later to check on the status of the inspection. (Dkt. No. 53-7, Ex. 7 at 4.) Mr. Bantsadze responded that morning by email, stating again that he

had "[l]eft repeated messages on multiple days" and was "still waiting for [Mr. Hahn] to call back." (*Id.* at 2.) RRReview then emailed Mr. Bantsadze regarding "the access issue," stating that RRReview had placed the order "on hold to obtain assistance from [SPS]." (*Id.*) The email further instructed Mr. Bantsadze to "[p]lease continue to follow up with the borrower on your end." (*Id.*)

On August 19, 2016, RRReview emailed Mr. Bantsadze an "order cancellation notice" instructing him not to proceed with the order. (Dkt. No. 53-8, Ex. 8 at 2.) Four days later, SPS sent a letter to Plaintiffs stating that SPS considered Plaintiffs' "request for loss mitigation assistance withdrawn" because SPS's "attempts to contact [Plaintiffs] to arrange for a property valuation, which is a requirement for a loss mitigation review, ha[d] been unsuccessful." (Dkt. No. 68, Ex. 100 at 5.) Mr. Hahn responded to the SPS's August 23 letter by fax on September 8, 2016, disputing "ever having received [a request for an appraisal]" and requesting that SPS immediately send him "a copy of such request." (Dkt. No. 68, Ex. 101 at 7.)

SPS responded to Mr. Hahn's September 8 fax on October 3, 2016, stating, in pertinent part:

> In your [September 8] inquiry, you requested to dispute our loss mitigation decision due to the request for an appraisal not being received. Please note a property valuation is required to proceed with the [loss mitigation application] review. As such we have verified that our multiple attempts to gain access into the property were unsuccessful. Therefore, the assistance request was withdrawn. If you wish to reapply for loss mitigation assistance, you must submit a new application and provide two good contact numbers, so that we may gain access to the property.

(Dkt. No. 68, Ex. 103 at 11.)

Mr. Hahn responded by fax on October 23, 2016, stating, in pertinent part:

> I continue to be available to accommodate your request for an appraiser and request that such request be sent to me in writing. I travel extensively in Asia and want to avoid miscommunication in arranging such a meeting. I intend to cooperate fully with my request for a loan modification and dispute any attempt on your part to suggest I have failed in any way to be responsive to any request.

(Dkt. No. 68, Ex. 104 at 14.) That same day Mr. Hahn filed another complaint with the Consumer Bureau against SPS. (*See* Dkt. No. 68, Ex. 105.)

### C.     The Notice of Default and Plaintiffs' Sale of the Residence

On September 13, 2016, Plaintiffs entered into a Residential Listing Agreement with Paragon Real Estate Group ("Paragon") to list the Residence for sale at $6,500,000.  (Dkt. No. 66, Ex. 65 at 151-55.)  Plaintiffs had initially engaged Paragon regarding sale of the Residence in July 2016.  (*See id.* at 150.)  On September 26, 2016, Paragon Broker Associate Diana M. Nelson emailed Plaintiffs and recommended listing the Residence for sale between $6,150,000 and $6,250,000.  (*See* Dkt. Nos. 54-3, Ex. 11 at 5:1-6 & 54-4, Ex. 12 at 2.)

On November 1, 2016, National Default recorded a "Notice of Default and Election to Sell Under Deed of Trust" with the San Francisco Assessor-Recorder.  (Dkt. No. 68, Ex. 106.)  The Notice of Default states that as of October 28, 2016, Plaintiffs were in default on the Note in the amount of $585,843.71.  (*Id.* at 20.)  SPS recorded a "Notice of Trustee's Sale" on February 14, 2017, setting a foreclosure sale for March 13, 2017.  (*See* Dkt. No. 68, Ex. 107 at 26; *see also* Dkt. No. 56 at ¶ 31.)  On February 27, 2017, SPS wrote Plaintiffs that SPS had "received and reviewed [Plaintiffs'] request for loss mitigation assistance," but there were "no available loss mitigation assistance options" and a foreclosure sale had been scheduled to "occur within the next 14 business days."  (Dkt. No. 68, Ex. 108 at 30.)

A few days later Plaintiffs retained Martin L. Hudler of Coast Equities, LLC to, in pertinent part, assist Plaintiffs in negotiating a forbearance agreement to avoid the pending foreclosure.  (Dkt. No. 68, Ex. 109 at 41.)  Approximately one week later, Plaintiffs recorded a Grant Deed with the San Francisco Assessor-Recorder, granting Mr. Hudler's company, Centurion Cascade, LLC ("Centurion"), a 7.5% interest in the Residence.  (*Id.* at 43; *see also* Dkt. No. 54-1 at 16:14-17.)  That same day Mr. Hudler filed a voluntary petition for bankruptcy on behalf of Centurion in the United States Bankruptcy Court for the District of Oregon.  (*See id.* at 48-73.)

On March 13, 2017, SPS suspended the foreclosure sale after "receiv[ing] notice that a third-party possessing an ownership [interest in the Residence] had filed for bankruptcy."  (Dkt. No. 56 at ¶ 32.)  SPS wrote Plaintiffs on March 16, 2017 notifying them that the foreclosure sale had been postponed and rescheduled for May 15, 2017.  (Dkt. No. 56-24, Ex. X.)  On March 27, 2017, Mr. Hahn faxed SPS another loss mitigation application with over 195 documents.  (*See*

Dkt. No. 68, Ex. 112 at 92.)

On April 19, 2017, SPS wrote Plaintiffs that the scheduled foreclosure sale had been cancelled. (Dkt. No. 56-25, Ex. Y.) The letter states, in pertinent part: "Should a new sale date be scheduled, SPS will send proper notice at that time. Please contact us immediately if you have any questions." (*Id.* at 2.) On May 31, 2017, Plaintiffs sold the Residence through Paragon for $5,595,000. (Dkt. No. 68, Ex. 113 at 94.) Mr. Hahn knew at the time of sale that there was no scheduled foreclosure sale. (*Id.* at 15:23-16:1, 19:7-12.)

## II.     Procedural History

Plaintiffs filed their original complaint in San Francisco Superior Court, bringing a single claim for violation of the Real Estate Settlement Procedures Act ("RESPA") under 12 U.S.C. § 2605. (Dkt. No. 1-2, Ex. A.) Plaintiffs then filed an amended complaint in June 2018, alleging claims under RESPA; California Business and Professions Code § 17200 (Unfair Competition Law ("UCL")); California Civil Code §§ 2923.5-2923.7 (Homeowner Bill of Rights ("HBOR")); and negligence. (*Id.* at 30.) Plaintiffs' amended state court complaint named the following defendants: SPS; National Default Servicing Corporation; Washington Mutual; Deutsche Bank National Trust Company; WaMu Mortgage Pass-Through Certificates, Series 2005 AR16; and Chase. Defendants removed the action to federal court on September 13, 2018 asserting federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441(a). (Dkt. No. 1.)

Defendants filed a motion to dismiss on September 20, 2018. (Dkt. No. 6.) One month later, Plaintiffs filed a notice of voluntary dismissal as to defendants Chase and Washington Mutual. (Dkt. No. 15.) On November 19, 2018, the Court granted in part and denied in part Defendants' motion to dismiss. The Court granted dismissal as to the non-SPS defendants without prejudice and dismissed the HBOR claim with prejudice; the Court denied the motion in all other respects. (*See generally* Dkt. No. 24.)

SPS filed the instant motion for summary judgment, or in the alternative, partial summary on the remaining claims on October 24, 2019. (Dkt. No. 52.) The motion is fully briefed, (*see* Dkt. Nos. 62 & 69), and the Court heard oral argument on December 19, 2019.

//

**DISCUSSION**

On summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the moving party does not bear the burden of persuasion at trial, it can satisfy its burden in two ways. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). "First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* If the moving party carries its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted). "In ruling on a motion for summary judgment, [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (internal quotation marks and citation omitted) (alteration in original).

**I.    RESPA**

RESPA regulates the servicing of mortgage loans. 12 U.S.C. § 2605. The Act authorizes the Consumer Bureau to prescribe rules and regulations to achieve RESPA's purpose, which it has done, in part, by promulgating Regulation X. Section 2605(f) of RESPA establishes a private right of action for a borrower to enforce RESPA and Regulation X. 12 U.S.C. § 2605(f); 12 C.F.R. § 1024.41(a). Regulation X, and specifically, 12 C.F.R. 1024.41, "specifies loss mitigation procedures that a borrower may enforce against a loan servicer." *Thomas v. Wells Fargo Bank, N.A.*, No. 15 CV 02344 GPC JMA, 2016 WL 1701878, at *3 (S.D. Cal. Apr. 28, 2016). Plaintiffs' First Amended Complaint asserts a RESPA claim for violations of 12 C.F.R. §§ 1024.41(b)(2), 1024.41(b)(2)(A) and (B), and 1024.41(c)(1). (Dkt. No. 1-2, Ex. A at ¶¶ 188-193.)

Defendant asserts that summary judgment is warranted on the RESPA claim because: (1) SPS complied with the specific RESPA provisions underlying Plaintiffs' claim; and (2) "Plaintiffs did not suffer any actual damages." (Dkt. No. 52 at 14-19.) The Court addresses each argument

in turn and concludes that summary judgment is warranted.

**A.    12 C.F.R. § 1024.41(b)**

Section 1024.41(b)(2) and subsections (A) and (B) concern a servicer's review of a borrower's loss mitigation application and provides:

> (i) Requirements. If a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, a servicer shall:
>
>> (A) Promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete; and
>>
>> (B) Notify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete. If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date pursuant to paragraph (b)(2)(ii) of this section. The notice to the borrower shall include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options.

12 C.F.R. § 1024.41(b)(2)(i)(A),(B).

Construing the record in the light most favorable to Plaintiffs, no reasonable trier of fact could find that SPS did not comply with section 1024.41(b)(2). Plaintiffs do not contend that SPS violated the 5-day deadline and, indeed, at oral argument Plaintiffs withdrew the (b)(2) claim in recognition that they cannot prove a violation. (Oral Argument at 1:14-1:15 (Dec. 19, 2019).) Accordingly, summary judgment is granted in SPS's favor on the RESPA claim to the extent it is premised on a violation of 12 C.F.R. § 1024.41(b)(2).

**B.    12 C.F.R. § 1024.41(c)**

**1.    Section 1024.41(c)(4)**

12 C.F.R. §1024.41(c)(4) became effective as an amendment to Regulation X on October 17, 2017—after the conduct at issue in this lawsuit. *See* Amendments to the 2013 Mortgage Rules Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z), 81 FR 72160-1, 2016 WL 6083237, 72160, 72255-72262 (Oct. 19, 2016). As a

United States District Court
Northern District of California

United States District Court
Northern District of California

preliminary matter, the Court must decide whether Plaintiffs may proceed to trial on a claim that SPS violated section 1024.41(c)(4). They may not.

First, the First Amended Complaint does not allege a violation of section 1024.41(c)(4) or even reference the version of Regulation X that became effective as of October 17, 2017. Plaintiffs' amended complaint makes this omission even though they filed it more than eight months after the amendment became effective. (*See* Dkt. No. 1-2, Ex. A at 30 (complaint signed June 2018).) Plaintiffs' belated oral argument request that they be allowed to amend the pleadings to conform to the evidence is denied. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Fed. R. Civ. P. 15(b). "This rule allows the pleadings to be amended to reflect the actual issues upon which a case was tried." *Prieto v. Paul Revere Life Ins. Co*., 354 F.3d 1005, 1012 (9th Cir. 2004). SPS has not consented to Plaintiffs bringing a section 1024.41(c)(4) claim; indeed, SPS promptly objected to Plaintiffs' apparent attempt to utilize §1024.41(c)(4) in its summary judgment opposition. (Dkt. No. 69 at 10-12.)

Plaintiffs suggest that SPS has at least impliedly consented because its motion for summary judgment quotes from the current version of Regulation X. The Court is not persuaded. It is true that SPS's motion quotes the current version of section 1024.41(c)(1). (*See* Dkt. No. 52 at 15.) That version differs from the earlier version only by referring to section (c)(4) as an exception. *See* Amendments, 2016 WL 6083237, at 72244 (noting that the amendment to section 1024.41(c)(1) constitutes only a "minor technical revision to § 1024.41(c)(1) to facilitate the addition of § 1024.41(c)(4)"); *see also* 12 C.F.R. §1024.41(c)(1)(2018) ("(1) Complete loss mitigation application. Except as provided in paragraph (c)(4)(ii) of this section, if a servicer . . ."). SPS's motion, however, does not substantively address a purported section 1024.41(c)(4) violation and nothing in its moving papers otherwise suggests that SPS believed such a claim was at issue.

Second, even if Plaintiffs had alleged a violation of section 1024.41(c)(4), the amendment does not apply retroactively to SPS's conduct in this case. *See Urdaneta v. Wells Fargo Bank N.A.*, 734 F. App'x 701, 705 (11th Cir. 2018) (holding that even though Regulation X was

amended in 2017, the mortgage servicer was only required to comply with the version in effect during the period that the borrower submitted a loan mitigation application); *see also Germain v. US Bank Nat'l Ass'n as Tr. for Morgan Stanley Mortg. Loan Tr. 2006-7*, 920 F.3d 269, 276 (5th Cir. 2019) (holding that section 1024.41 is not retroactive); *Campbell v. Nationstar Mortg.*, 611 F. App'x 288, 296 (6th Cir. 2015) (same). The courts' reasoning in those cases is persuasive based on the effective date of the 2013 and 2016 amendments, which the Consumer Bureau expressly set to occur months *after* adoption of those amendments. *See, e.g.,* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 FR 10696–01 (February 14, 2013) (codified at 12 C.F.R. § 1024) ("This final rule is effective on January 10, 2014."); Amendments to the 2013 Mortgage Rules Under the Equal Credit Opportunity Act (Regulation B), Real Estate Settlement Procedures Act (Regulation X), and the Truth In Lending Act (Regulation Z), 78 FR 60382-01, 60382 (Oct. 1, 2013) (providing that "the new regulations would apply to transactions for which applications were received on or after January 10, 2014"); Amendments, 2016 WL 6083237, at 72160 ("This final rule is effective on October 19, 2017."). It makes no sense to hold that the 2017 amendment applies retroactively even though the enacting agency expressly ruled that the amendment would not be effective until one year after its adoption. *See Campbell,* 611 F. App'x. at 296 (reasoning that if the agency had intended the 2013 amendment to Regulation X to apply retroactively it could have made the rule effective immediately). Further, to hold that section 1024.41(c)(4) applies retroactively to a loan mitigation application submitted before it became effective "would impose a duty on servicers before the duty existed and before servicers were aware of its requirements." *Germain*, 920 F.3d at 276.

It is undisputed that Plaintiffs sold the Residence nearly five months before subsection (c)(4) became effective in October 2017 and that they applied for loss mitigation even earlier. Thus, the Court will not consider SPS liable for conduct that Regulation X did not proscribe at the time it was servicing Plaintiffs' mortgage. That being said, that Plaintiffs cannot go to trial on a section 1024.41(c)(4) claim does not mean that the 2017 Regulation X amendment is irrelevant. The Court can consider the amendment and accompanying commentary in interpreting the earlier version of Regulation X that applies to Plaintiffs' claims.

Accordingly, the question on summary judgment is whether a reasonable trier of fact could find that SPS violated §1024.41(c)(1) as pled in the First Amended Complaint.

### 2. Section 1024.41(c)(1)

Section 1024.41(c)(1) concerns a servicer's "[e]valuation of loss mitigation applications" and provides:

> (1) Complete loss mitigation application. If a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall:
>
> (i) Evaluate the borrower for all loss mitigation options available to the borrower; and
>
> (ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

12 C.F.R. § 1024.41(c)(1) (2014). Regulation X defines "complete loss mitigation application" as "an application in connection with which a servicer has received all the information that the servicer requires from the borrower in evaluating applications for the loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(b)(1).

SPS moves for summary judgment on the grounds that no reasonable trier of fact could find that SPS did not comply with Regulation X after Plaintiffs submitted complete loss mitigation applications in March 2015 and July 2016. Plaintiffs respond that on both occasions SPS demanded a third-party appraisal of the property and that, having been unable to obtain such an appraisal at no fault of Plaintiffs, SPS unlawfully withdrew Plaintiffs' loss mitigation application in violation of 12 C.F.R. § 1024.41(c)(1). As Plaintiffs explained at oral argument, their position is that Regulation X did not give SPS the option of requiring an appraisal before granting or denying their loss mitigation application within 30 days of receipt of a complete loss mitigation application. Plaintiffs thus argued that given that SPS was unable to obtain an appraisal within 30

14

days it should have granted or denied Plaintiffs' application, rather than deeming it withdrawn. (Oral Argument at 1:19-1:26 (Dec. 19, 2019).)

The Court is not persuaded by Plaintiffs' reading of 12 C.F.R. § 1024.41(c)(1). Section 1024.41(c)(1) required SPS to provide Plaintiffs with written notice of its determination within 30 days after Plaintiffs submitted a complete loss mitigation application. SPS notified Plaintiffs of its decision within 30 days of its receipt of the March 2015 and July 2016 complete applications—its decision to deem the application withdrawn on account of the inability to obtain an appraisal.[3]

Further, Regulation X specifically contemplates that the servicer may require more information after the borrower has submitted a complete loss mitigation application. It does so by stating that if a servicer discovers after receipt of a "complete" loss mitigation application "that additional information . . . [is] required to complete the application, the servicer must promptly request the missing information . . . and treat the application as complete for purposes of paragraph (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application." 12 C.F.R. § 1024.41(c)(2)(iv).[4] Where the servicer discovers it needs more information, the loss mitigation application is considered "facially complete." 12 C.F.R. § 1024.41(c)(2)(iv); *see also Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1006 (11th Cir. 2016) ("Once the borrower submits the requested materials or if the servicer initially determines that the application is complete, then the application is considered 'facially complete' for purposes of § 1024.41."). SPS's request for an appraisal falls within this provision.

---

[3] The Court recognizes that as to the March 2015 complete application, SPS erroneously told Plaintiffs that *Plaintiffs* had withdrawn the application. Plaintiffs do not assert that this erroneous communication creates a genuine dispute as to the reason SPS withdrew the application it deemed complete in March 2015. (*See* Dkt. No. 62 at 10.) Instead, Plaintiffs appear to agree that SPS considered the application withdrawn because SPS was unable to obtain an appraisal, as SPS later clarified to Plaintiffs. (*See* Dkt. No. 66, Ex. 61 at 129.) As discussed below, even if there is a genuine dispute whether SPS actually withdrew the application because it mistakenly believed Plaintiffs had withdrawn it and not because of the inability to obtain an appraisal, and that such mistake would violate 12 C.F.R. § 1024.41(c)(1), no reasonable trier of fact could find that this violation caused Plaintiffs any recoverable damages.

[4] Sections (f) and (g) prohibit foreclosure proceedings while the loss mitigation application is pending. *See* 12 C.F.R. §§ 1024.41(f),(g). Plaintiffs' First Amended Complaint does not allege a violation of these subsections. (*See* Dkt. No. 1-2, Ex. A at 84-85.)

United States District Court
Northern District of California

Plaintiffs contend that the subsequent adoption of 12 C.F.R. § 1024.41(c)(4) and the Consumer Bureau's accompanying commentary demonstrate that Regulation X required SPS in 2015 and 2016 to grant or deny Plaintiffs' complete loss mitigation application within 30 days even without an appraisal.[5] Section 1024.41(c)(4) is entitled "Information not in the borrower's control" and provides that if a servicer requires such information—which drawing all inferences in Plaintiffs' favor would include an appraisal—the servicer must exercise reasonable diligence in obtaining the information. 12 C.F.R. § 1024.41(c)(4)(i). Moreover, the servicer cannot deny the application solely because the servicer lacks information not in the borrower's control, unless it has exercised reasonable diligence to obtain such information and provides the borrower with notice. 12 C.F.R. § 1024.41(c)(4)(ii). As explained above, section 1024.41(c)(4) does not apply here because the conduct at issue occurred after the effective date of the rule and the rule is not retroactive. Plaintiffs nonetheless argue that because the amendment created an exception to the servicer's obligation to evaluate the loss mitigation application within 30 days, *see* 12 C.F.R. § 1024.41(c)(1), the prior version without the section (c)(4) exception must have required the servicer to grant or deny a complete application within 30 days even if it had not received information it deemed necessary that was not in the borrower's control.

Plaintiffs' argument is contradicted by the very commentary they cite in their sur-opposition. Plaintiffs attach the Bureau's commentary to their sur-opposition and emphasize the following quote:

> Servicers informed the Bureau before the proposal that they were unsure how to remain in compliance with § 1024.41 when lacking necessary third-party information at the end of the 30-day evaluation period. According to servicers, they have adopted different approaches. In pre-proposal outreach, the Bureau learned that some wait until the third-party provides the information before making any decision on the application, even if it results in a delay beyond the 30 days provided for in § 1024.41(c)(1). One servicer told the Bureau it sends denial notices to borrowers in these circumstances but also informs borrowers that it will reevaluate the application upon receipt of the third-party information. The Bureau explained in the proposal that, although neither of these solutions appears to preclude a

---

[5] Plaintiffs make this argument in their "sur-opposition" even though there is no reason it could not and should not have been made in their opposition. The Court has nonetheless considered the sur-opposition arguments and citations.

16

> borrower from receiving loss mitigation, neither provides borrowers with clear information about the status of the application, and the latter practice may erode borrower protections under § 1024.41. The Bureau expressed concern in the proposal that the absence of clear information about the status of the loss mitigation application may cause borrowers to abandon their pursuit of loss mitigation, or to be uncertain about their loss mitigation options and how they may pursue their rights under § 1024.41.

(Dkt. No. 72-2 at 12.)  Despite being aware that servicers, such as SPS, were not acting on "complete" applications pending receipt of information not in the borrowers' control, and were even denying loss mitigation applications because of the inability to obtain information not in the borrowers' control, the Consumer Bureau never states in the commentary that such conduct violated Regulation X.  Instead, the Consumer Bureau explained that the servicers' conduct did not "appear[ ] to preclude a borrower from receiving loss mitigation."  (*See id.*)  The Consumer Bureau was also concerned, however, that such conduct might confuse borrowers about their options.  Accordingly, the Bureau enacted section 1024.41(c)(4) to expressly address when and how a servicer can deny a loss mitigation application due to a lack of information not in the borrower's control.  The commentary thus does not support Plaintiffs' insistence that in 2015 and 2016 section 1024.41(c)(1) precluded a borrower from denying a loss mitigation application due to an inability to obtain an appraisal.

Plaintiffs also cannot identify any action taken by the Consumer Bureau to enforce Regulation X in the manner it asks the Court to enforce it here.  Instead, to balance the servicers' need for information with the borrowers' need for timely information and decisions, the Bureau amended Regulation X to prohibit denial based on a lack of information not in the borrower's control unless the servicer diligently undertook certain actions.  But the amendment does not mean that the earlier version of Regulation X prohibited denials on such grounds; instead, the Consumer Bureau was refining the relatively new regulation to address actual practice.

With this legal interpretation in mind, the "genuine disputes of fact" Plaintiffs identify in their opposition, (*see* Dkt. No. 62 at 10), are not "material."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  The Court agrees that a reasonable trier of fact could find that the appraiser hired by SPS to perform an

appraisal of Plaintiffs' Residence did not attempt to contact Plaintiffs to secure access to their home. That dispute is immaterial, however, given that nothing in the version of Regulation X applicable to this case would make SPS liable because it deemed Plaintiffs' application withdrawn based on its inability to obtain the appraisal, even if it was the appraiser's fault that no appraisal was performed. Further, while the Court does not necessarily agree that a trier of fact could find that SPS was lying when it informed Plaintiffs that it required an appraisal of their home to complete their evaluation of Plaintiffs' loss mitigation application, even assuming the record would support such a finding, RESPA and Regulation X do not govern or limit the information a servicer may require to evaluate a loss mitigation application. *See* Regulation X, 78 FR 10696-01 at 10829. ("[Section] 1024.41(c)(1) does not require that an evaluation meet any standard other than the discretion of the servicer. Accordingly, the Bureau intends that the requirement that a servicer evaluate a borrower for all loss mitigation options available from an owner or assignee of a mortgage loan sets forth the procedure that must be followed by servicers but does not create, in itself, a requirement that a servicer conduct such evaluation in any particular manner."); *White v. Wells Fargo Bank, N.A.*, No. 1:15-CV-4449-SCJ-JSA, 2016 WL 11581943, at *3 (N.D. Ga. Aug. 1, 2016), report and recommendation adopted, No. 1:15-CV-4449-SCJ-JSA, 2016 WL 11581941 (N.D. Ga. Sept. 15, 2016) ("Regulation X is not a vehicle for borrowers to challenge the substantive basis for a servicer's loan modification decisions. Rather, those decisions are left to the sole discretion of the servicer, and are not subject to judicial second-guessing under Regulation X.").

In sum, no reasonable trier of fact could find that SPS violated Regulation X. Summary judgment in SPS's favor is thus required on Plaintiffs' RESPA claim.

### C. Plaintiffs Fail to Demonstrate Actual Damages

Even assuming a reasonable trier of fact could find that SPS violated Regulation X by deeming the loss mitigation applications withdrawn because it was unable to obtain an appraisal, Plaintiffs' claim would still fail because for the most part the record does not support a finding that the alleged RESPA violations caused them any damages. *See Carswell v. JP Morgan Chase Bank N.A.*, 500 F. App'x 580, 582 (9th Cir. 2012) (stating that actual damage is a required element of a

18

RESPA claim); *see also Loewy v. CMG Mortg., Inc.*, 385 F. Supp. 3d 1083, 1088 (S.D. Cal. 2019) (noting that "even if [the defendant's] actions did violate RESPA, summary judgment would still be warranted because the [plaintiffs] have not shown any damages causally linked to [the defendant's] alleged [RESPA violation]"); *Lal v. Am. Home Servicing, Inc.*, 680 F. Supp. 2d 1218, 1223 (E.D. Cal. 2010) (noting that the actual damages alleged "must be related to the RESPA violation itself"); *Allen v. United Fin. Mortg. Corp.*, 660 F. Supp. 2d 1089, 1097 (N.D. Cal. 2009) (dismissing RESPA claim because the plaintiff failed "to show that the alleged RESPA violations caused any kind of pecuniary loss"); *see also Flate v. Mortg. Lenders Network USA, Inc.*, No. CV 15-08873-AB (FFMx), 2016 WL 9686051, at *3 (C.D. Cal. 2016) (noting that "damages alleged for violations of 12 C.F.R. section 1024.41 must be a direct result of the [defendant's] failure to comply with the statutory provisions at issue") (alteration in original) (internal quotation marks and citation omitted); *Ramanujam v. Reunion Mortg.*, Inc., No. 5:09-cv-03030-JF/HRL, 2011 WL 446047, at *5 (N.D. Cal. Feb. 3, 2011) (granting summary judgment on RESPA claim where plaintiff failed to demonstrate pecuniary damages caused by defendant's alleged violation); *Allen v. United Fin. Mortg. Corp.*, No. 09-2507 SC, 2010 WL 1135787, at *5 (N.D. Cal. Mar. 22, 2010) (noting plaintiff's "obligation to point to some colorable relationship between [the] injury and the actions or omissions that allegedly violated RESPA").

### 1. Denied Application Versus Withdrawn Application

As explained above, SPS had the discretion to require an appraisal before offering Plaintiffs a loss mitigation option. Thus, under Plaintiffs' theory, and drawing all reasonable inferences in their favor, having been unable to obtain an appraisal within 30 days of Plaintiffs having submitted a complete application, SPS should have denied their application rather than deeming it withdrawn.[6] But a denial would have caused the same damage to Plaintiffs as a withdrawn application; indeed, it is actually worse because under RESPA the servicer has no obligation to consider a further application once it has denied a previous complete application.

---

[6] As 12 C.F.R. § 1024.41(c)(4) does not apply, at the relevant time Regulation X did not prohibit denying a loss mitigation application because the servicer was unable to obtain information not in the borrower's control.

*See* 12 C.F.R. § 1024.41(i) ("A servicer must comply with the requirements of this section for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a complete loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application.").

At the summary judgment hearing Plaintiffs explained that had SPS denied Plaintiffs' application SPS would have been required to provide notice of appeal rights. (Oral Argument at 1:28-1:33 (Dec. 19, 2019).) However, SPS did advise Plaintiffs of their appeal rights in the August 2016 letter advising Plaintiffs that SPS deemed Plaintiffs' second complete application withdrawn. (*See* Dkt. No. 56-23, Ex. W at 3.) In other words, Plaintiffs have not articulated a viable theory as to how they were damaged by being timely notified of a *withdrawn* application as opposed to a *denied* application. Further, as to the March 2015 subsequently withdrawn "complete" application, before any Notice of Default was ever filed SPS notified Plaintiffs in July 2016 that they had again submitted a complete application. Plaintiffs do not offer evidence of how the earlier withdrawal of the application caused them damage.

Finally, and as explained previously, Plaintiffs cannot challenge SPS's right to require an appraisal based upon a walk-through of the residence because RESPA does not govern what information a servicer may require for loss mitigation evaluation. But even if RESPA required SPS to evaluate Plaintiffs' application without an appraisal, the record does not include evidence from which a reasonable trier of fact could find that Plaintiffs would have qualified for a loss mitigation option. Thus, the result would be the same: a denied loss mitigation application, a Notice of Trustee's Sale, the sale of the Residence, and no damage caused by the purported RESPA violation.

### 2. Improper Foreclosure Fees and Loss of Equity

Plaintiffs do not claim that SPS violated the Regulation X provisions that prohibit foreclosure proceedings while a loss mitigation application is pending. *See* 12 C.F.R. § 1024.41(f), (g). Thus, damages arising from the proposed foreclosure proceedings could not have been caused by the RESPA violations Plaintiffs allege in this action. Further, it is undisputed that

there was no foreclosure sale, nor was there a foreclosure sale even pending when Plaintiffs sold the Residence in May 2017. It is thus unsurprising that Plaintiffs have not identified any foreclosure fees that they paid.

Plaintiffs also allege that SPS's recording of the Notice of Trustee's Sale resulted in "lost equity" in the Residence. But if as Plaintiffs contend SPS erred by withdrawing rather than denying the loss mitigation applications due to the lack of an appraisal, the Notice of Trustee's Sale would have been recorded even if there was a denial. Thus, as explained above, no reasonable trier of fact could find that the alleged violations caused the claimed damage.

Further, Mr. Hahn testified that the "lost equity" constitutes "the difference in the sale price or fair value of the property before the [Notice of Default] and foreclosure proceedings" and the actual sales price of $5,595,000. (*See* Dkt. No. 54-1, Ex. 9 at 21:1-13.) However, Plaintiffs fail to provide any evidence to support that assertion; instead, such damages are too speculative to survive summary judgment. *See Navellier v. Sletten*, 262 F.3d 923, 939 (9th Cir. 2001) (affirming district court's grant of summary judgment in part because plaintiffs' asserted damages were "too speculative," and noting that "damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery") (internal quotation marks and citation omitted).

Plaintiffs' opposition asserts that "[t]he existence and amount" of damages are not "'pure speculation' because they are a proper subject of Expert testimony about the demonstrable and substantial negative impact on the market price for the Residence which flowed from SPS'[s] illegal failures to consider in good faith a loan modification and then its illegally foreclosing [sic] on the property." (Dkt. No. 62 at 17-18.) However, to survive summary judgment, Plaintiffs must set forth *evidence* to support their claims; attorney argument suggesting that Plaintiffs will submit expert testimony at trial as to the existence of damages does not suffice. *See Celotex*, 477 U.S. at 331 ("If the nonmoving party [with the burden of persuasion at trial] cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law."). The parties' stipulation to extend the expert discovery deadline did not prevent Plaintiffs from producing evidence to support their damages theory. (See

Dkt. No. 61.)

### 3. Sale of the Residence

Plaintiffs relatedly assert that Defendant's RESPA violations resulted in "the loss of over One Million Dollars" in the "fire-sale" of the Residence. (Dkt. No. 1-2, Ex. A at ¶ 82.) Plaintiffs' opposition references a February 2017 "sidewalk" appraisal conducted by RRReview in February 2017 reflecting a "Probable . . . As Is List Price" of $6,115,000, (*see* Dkt. No. 67, Ex. 98 at 201); however, that evidence does not support a finding that the ultimate sale price was affected by any unlawful activity by SPS.[7] *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) ("A nonmovant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment."). Further, assuming a trier of fact could find that the proposed foreclosure proceedings caused Plaintiffs to sell, no reasonable trier of fact could find that SPS's alleged RESPA violation—withdrawal of the loss mitigation applications due to inability to obtain an appraisal—caused the initiation of those proceedings in the absence of evidence establishing that Plaintiffs would have qualified for a loss mitigation option.

### 4. "Wrongfully Assessed" Fees and "Ruined Credit"

Plaintiffs' opposition fails to address the First Amended Complaint's allegation that they have been "wrongfully assessed thousands of dollars in fees" and "had their credit ruined" as a result of SPS's conduct. Ms. Montgomery testified that "there were lots of fees and charges that we had this misfortune of paying," that she "assume[s] were paid to SPS." (Dkt. No. 54-2, Ex. 10 at 15:1-10.) However, in the absence of any evidence that such "fees and charges" were paid as a result of a § 1024.41(c)(1) violation for failure to provide a written determination on Plaintiffs' loss mitigation applications, Plaintiffs fail to establish that such damages are directly linked to any RESPA violation. *See Stefanchik*, 559 F.3d at 929.

//

---

[7] The probable "as is list price" in the RRReview appraisal tracks the September 2016 email from Paragon Broker Associate Diana M. Nelson to Plaintiffs in which Ms. Nelson recommended listing the Residence for sale between $6,150,000 and $6,250,000. (*See* Dkt. Nos. 54-3, Ex. 11 at 5:1-6 & 54-4, Ex. 12 at 2.) Ms. Nelson testified that the recommended range "was still an aggressive price." (Dkt. No. 54-3, Ex. 11 at 7-11.) Ms. Nelson testified that when the Residence sold for $5,595,000 in May 2017, there were no other offers. (*See id.* at 8:19-24.)

### 5.    Emotional Distress

Plaintiffs allege that they "have suffered anxiety, nausea, stress and strain in feeling that their home was going to be foreclosed and their requests for help were being ignored." (Dkt. No. 1-2, Ex. A at ¶ 193.) Defendant asserts that summary judgment is warranted because emotional distress damages are not recoverable under RESPA and Plaintiffs otherwise fail to provide evidence that any emotional injury is linked to the alleged RESPA violations.

The Ninth Circuit has yet to determine whether emotional distress can constitute actual damages under RESPA, and there is no consensus among district courts. *See Hackett v. Wells Fargo Bank*, N.A., No. 2:17–cv–7354–CAS(ASx), 2018 WL 1224410, at *5 (C.D. Cal. Mar. 5, 2018) (collecting cases recognizing split of authority and concluding that emotional distress can constitute actual damages at the pleading stage); *see also Ramanujam*, 2011 WL 446047, at *5-6 (granting summary judgment on RESPA claim in part because damages for "emotional and mental distress are not pecuniary damages that can support a claim under RESPA"). Plaintiffs' opposition asks the Court to follow unpublished, out-of-circuit authority and conclude that emotional distress damages are available under RESPA. (*See* Dkt. No. 62 at 18 (citing *Ranger v. Wells Fargo Bank*, 757 F. App'x 896, 902 (11th Cir. 2018).)

Assuming, without deciding, that emotional distress constitutes "actual damages" under RESPA, the only such damages that could be recoverable would have to arise from SPS's withdrawal of Plaintiffs' "complete" loss mitigation applications in April 2015 and August 2016. While most of the emotional distress identified by Plaintiffs arise from the foreclosure proceedings and the ongoing communications with SPS, (*see, e.g.,* Dkt. No. 62 at 19; Dkt. No. 54-1, Ex. 9 at 18:4-7; *see also id.* 19:19-25 (testifying to "anxiety" and "stress" related to selling the Residence)), the Court cannot conclude as a matter of law that no reasonable trier of fact could find that SPS's withdrawal of Plaintiffs' loss mitigation applications due to SPS's inability to obtain an appraisal did not cause Plaintiffs any emotional distress, especially given the amount of "back and forth" Plaintiffs had to engage in with SPS before SPS finally deemed their applications "complete." Nonetheless, as explained above, SPS's conduct in withdrawing Plaintiffs' applications did not violate section 1024.41(c)(1). Further, even if such conduct did violate

23

Regulation X, there is no evidence suggesting that Plaintiffs would not have suffered the same emotional distress had SPS simply denied their loan modification applications.

***

For the reasons stated above, no reasonable trier of fact could find that SPS's timely decisions to deem Plaintiffs' loss mitigation applications withdrawn rather than denied violated Regulation X, 12 C.F.R. § 1024.41(c)(1). And, even assuming that such conduct violates Regulation X as in effect at the time of the conduct, on this record no reasonable trier of fact could find that withdrawing rather than denying the applications damaged Plaintiffs. Accordingly, the Court GRANTS Defendant's motion for summary judgment as to Plaintiffs' RESPA claim.

## II. UCL

The UCL prohibits, and provides civil remedies for, "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (internal quotation marks and citation omitted). Plaintiffs' First Amended complaint asserts three separate claims under the UCL, representing the "unfair," "fraudulent," and "unlawful" practices prohibited under the statute. (*See* Dkt. No. 1-2, Ex. A at 85-89.)

Defendant asserts that summary judgment on Plaintiffs' UCL claims is warranted because: (1) the claims "are derivative of Plaintiffs' RESPA claim," and thus fall with that claim; and (2) Plaintiffs' have not demonstrated an injury in fact to confer standing under the UCL. (Dkt. No. 52 at 20.) Plaintiffs offer no argument in opposition; indeed, Plaintiffs' opposition does not even address their UCL claim. (*See generally* Dkt. No. 62.) The Court addresses each UCL claim separately below.

### A. Unlawful Prong

UCL claims under the unlawful prong "borrow[ ] violations of other laws . . . and make[ ] those unlawful practices actionable under the UCL." *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007). "Thus, a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." *Id.* Accordingly, UCL claims under the

24

unlawful prong "stand or fall depending on the fate of the antecedent substantive causes of action." *Krantz v. BT Visual Images, LLC*, 89 Cal. App. 4th 164, 178 (2001); *see also Davis v. Wells Fargo Bank, N.A.*, No. C 10-0489 PJH, 2011 4479428, at *7 (N.D. Cal. Sept. 26, 2011) (granting summary judgment as to UCL claim where the claim was premised on same allegations forming basis for underlying substantive claim).

Here, Plaintiffs' UCL claim under the unlawful prong is based on Defendant's alleged violation of RESPA. (*See* Dkt. No. 1-2, Ex. A at ¶ 211 ("SPS's misconduct herein violates RESPA, 12 C.F.R. § 1024.41. Those violations are sufficient to support Plaintiffs' claim under the unlawful prong of the UCL.").) Thus, because the Court grants summary judgment as to Plaintiffs' RESPA claim, Plaintiffs' UCL claim under the unlawful prong fails.

Defendant's blanket assertion that Plaintiffs' claims under the unfair and fraudulent prongs of the UCL also fall with Plaintiffs' RESPA claim is incorrect as a matter of law, however, because it treats Plaintiffs' three individual UCL claims as one. In general, only claims under the "unlawful" prong require a predicate statutory violation and rise and fall with that underlying claim. *See Lee v. Pep Boys-Manny Moe & Jack of California*, 186 F. Supp. 3d 1014, 1034 (N.D. Cal. 2016) ("Under the unfairness prong of the UCL, a practice may be deemed unfair even if not specifically proscribed by some other law."); *see also Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1117 (N.D. Cal. 2016) ("Each of the three prongs of the UCL provides a separate and distinct theory of liability and an independent basis for relief.") (internal quotation marks and citation omitted). Thus, the Court will address Defendant's argument that summary judgment is warranted as to Plaintiffs' remaining UCL claims for lack of standing.

## B. Standing to Assert Claims under the Unfair and Fraudulent Prongs

To establish standing under the UCL, a plaintiff must have suffered an injury in fact. *Rojas-Lozano*, 159 F. Supp. 3d at 1119. A plaintiff suffers an injury in fact sufficient to confer standing when he or she: (1) expended money due to defendant's unfair acts; (2) lost money or property; or (3) has been denied money to which he or she has a cognizable claim. *Id.* Defendant asserts that Plaintiffs fail to establish standing because they "have not incurred any damages attributable to anything SPS did during the modification review process and therefore cannot

satisfy the injury-in-fact requirement." (Dkt. No. 52 at 20.) For the reasons previously stated with regard to Plaintiffs' RESPA claim, the Court agrees. Plaintiffs' UCL claims are premised on Defendant's alleged "failure to timely or accurately process loss mitigation applications," (*see* Dkt. No. 1-2, Ex. A at ¶¶ 197, 203), however, Plaintiffs fail to show that their injuries flowed from Defendant's conduct and not from their default in December 2013 and the loan application process in general.

Further, Plaintiffs present no evidence suggesting that they had the ability to cure their default, or otherwise would have been approved for a loan modification. Thus, Plaintiffs have not shown any injury in fact from SPS's alleged failure to timely and accurately process Plaintiffs' loss mitigation applications. *See Benson v. Ocwen Loan Servicing, LLC*, 562 F. App'x 567, 571 (9th Cir. 2014) (affirming grant of summary judgment on UCL claim where plaintiff did not show "an injury in fact from the defendants' alleged failure to allow him to cure" his default because "no evidence suggests [the plaintiff] had the ability to [do so]").

Plaintiffs assert that the "enormous amount of equity indisputably provided sufficient security to require SPS to afford" Plaintiffs a loan modification. (Dkt. No. 62 at 5.) That is just argument, however; it is not evidence that Plaintiffs had the ability to cure their default or were otherwise entitled to a loan modification. In the absence of such evidence, Plaintiffs' UCL claims fail.

### III. Negligence

To prevail on a negligence claim under California law, a plaintiff must demonstrate: (1) "the existence of duty (the obligation to other persons to conform to a standard of care to avoid unreasonable risk of harm to them)"; (2) "breach of duty (conduct below the standard of care)"; (3) "causation (between the defendant's act or omission and the plaintiff's injuries)"; and (4) damages. *Merrill v. Navegar*, 26 Cal. 4th 465, 500 (2001). The existence of duty is "the threshold element of a cause of action for negligence," and "[w]hether this essential prerequisite has been satisfied in a particular case is a question of law." *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1196-97 (9th Cir. 2001) (internal quotation marks and citation omitted). Defendant asserts that summary judgment is warranted for the threshold reason that it owed no duty to Plaintiffs in

processing their loan modification applications. The Court agrees.

California courts have recognized that "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." *Nymark v. Heart Fed. Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1096 (1991). This general rule "applies to loan servicers." *Lingad v. Indymac Fed. Bank*, 682 F. Supp. 2d 1142, 1149 (E.D. Cal. 2010). The rule is not absolute, however, and "courts sometimes apply the so-called *Biakanja* factors to determine whether a duty is owed [to a borrower] under a narrow exception to the general rule." *Hutchins v. Nationstar Mortg. LLC*, No. 16-CV-07067-PJH, 2017 WL 4224720, at *14 (N.D. Cal. Sept. 22, 2017). The *Biakanja* factors include: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

California appellate courts are split on whether a loan servicer owes a duty of care to the borrower in the servicer's processing and review of loan modification applications. *See, e.g., Sheen v. Wells Fargo Bank, N.A.*, 38 Cal. App. 5th 346, 358 (2019) (holding that "a lender does not owe a borrower a common law duty to offer, consider, or approve a loan modification"); *Alvarez v. BAC Home Loans Servicing*, 228 Cal. App. 4th 941 (2014) (holding loan servicer owed duty of care); *Lueras v. BAC Home Loans Servicing*, LP, 221 Cal. App. 4th 49, 67–78 (2013) ("The *Biakanja* factors do not support imposition of a common law duty to offer or approve a loan modification."). Federal district courts in California, including this one, have agreed with *Lueras* that there is no common law duty of care by a servicer with regards to the key functions of a money lender, including the processing and review of loan modification applications. *See, e.g., Taylor v. Bosco Credit, LLC*, 2018 WL 6511150, at *4 (N.D. Cal. Dec. 11, 2018) (concluding the lender did not owe borrower a common law duty of care); *Galvez v. Wells Fargo Bank, N.A.*, No. 17-cv-06003-JSC, 2018 WL 2761917, at *8 (N.D. Cal. June 7, 2018) (concluding that servicer owed no common law duty of care to borrower to properly process loan

modification application); (*Peterson v. Wells Fargo Bank, N.A.*, No. 17-cv-05137-HSG, 2017 WL 6539743, at *5 (N.D. Cal. Dec. 21, 2017) (concluding the lender did not owe borrower a common law duty of care in reviewing loan modification application); *Marques v. Wells Fargo Bank, N.A.*, No. 16-cv-03973-YGR, 2016 WL 5942329, at *8 (N.D. Cal. Oct. 13, 2016) (finding "the reasoning in *Lueras* more persuasive in finding that mortgage servicers do not owe borrowers a duty of care in the processing of loan modification applications"); *Williams v. Wells Fargo Bank, N.A.*, No. EDCV 13-02075 JVS (DTBx), 2014 WL 1568857, at *7 (C.D. Cal. 2014) ("The Court concludes in accordance with the line of cases holding that loan modification—a renegotiation of the loan's terms—is so related to 'the key functions of a money lender' as to not give rise to an enforceable duty of care to the borrower.").

The Ninth Circuit considered this issue in *Anderson v. Deutsche Bank Nat. Tr. Co. Americas* and held "that application of the *Biakanja* factors does not support imposition of such a duty where, as here, the borrowers' negligence claims are based on allegations of delays in the processing of their loan modification applications." 649 F. App'x 550, 552 (9th Cir. 2016), *cert. denied sub nom. Anderson v. Aurora Loan Servs., LLC*, 137 S. Ct. 496 (2016). The *Anderson* court relied upon language from *Lueras* noting that "when, as here, the modification was necessary due to the borrower's inability to repay the loan, the borrower's harm, suffered from denial of a loan modification, [is] not . . . closely connected to the lender's conduct. Similarly, when 'the lender did not place the borrower in a position creating a need for a loan modification, [ ] no moral blame . . . attache[s] to the lender's conduct.'" *Id.* (quoting *Lueras*, 221 Cal. App. 4th at 67 (alterations in original)); *see also Badame v. J.P. Morgan Chase Bank, N.A.*, 641 F. App'x 707, 709 (9th Cir. 2016) (affirming district court's grant of summary judgment on negligence claim because defendant "did not have 'a common law duty of care to offer, consider, or approve a loan modification'") (quoting *Lueras*, 221 Cal. App. 4th at 67); *Benson v. Ocwen Loan Servicing, LLC*, 562 F. App'x 567, 569-70 (9th Cir. 2014) (affirming district court's dismissal of borrower's negligence claim against loan servicer and trustee because neither owed plaintiff "a common law duty of care") (citing *Lueras*, 221 Cal. App. 4th at 67).

The Court finds the Ninth Circuit's reasoning and reliance on *Lueras* persuasive and

adopts it here.  Accordingly, summary judgment is granted in Defendant's favor on the negligence claim.

## IV.     Other Issues

### A.     Request for Judicial Notice

The Court grants Defendant's request for judicial notice.

### B.     Evidentiary Objections

Defendant's reply briefing includes an attached "Objections to Evidence" that objects on various grounds to the declarations of Mr. Hahn and Ms. Montgomery.  (Dkt. No. 69-1.) Defendant's evidentiary objections do not comply with the Civil Local Rules.  Under Local Rule 7-3(c), any evidentiary objections "to the opposition must be contained within the reply brief or memorandum."  Here, Defendant's objections are not contained *within* the reply brief but are instead included as an attachment to same.  Accordingly, the Court declines to consider Defendant's separate "Objections to Evidence" and "will only address the evidentiary arguments to the extent they are raised" in Defendant's reply brief.  *See Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) (denying defendant's separately-filed motion to strike based on a similar violation of Local Rule 7-3(c)).

To that end, Defendant asserts in its reply that Mr. Hahn's 36-page declaration constitutes an attempt to circumvent the page limitations set forth in the Local Rules.  (Dkt. No. 69 at 6.)  The Court agrees.

Plaintiffs' opposition asserts, in pertinent part:

> Hahn's Declaration presents an overwhelming case of SPS' outrageous pattern of three years of violations of RESPA and negligence in the absurd way it stonewalled Plaintiffs' attempt to obtain a Loan Modification.  ***The Declaration speaks for itself and cannot be usefully condensed or summarized in this Memorandum. We encourage the Court to study all of it***.

(Dkt. No. 62 at 4 (emphasis added).)  Under Local Rule 7-3(a), an opposition "brief or memorandum may not exceed 25 pages of text."  Plaintiffs' opposition brief consists of only 20 pages, including its Table of Contents and Table of Authorities.  (*See generally* Dkt. No. 62.)  Mr. Hahn's declaration, on the other hand, consists of 130 paragraphs covering 36 pages, and includes

a "Preliminary Statement," "Summary of Declaration of Facts," and a "Detailed Declaration of Facts" that contain multiple statements of opinion and argument. (*See generally* Dkt. No. 62-1.) Plaintiffs' use of Mr. Hahn's declaration to set forth arguments that could have been included in its opposition briefing evinces an attempt to evade the page limitations set forth under Local Rule 7-3(a). Mr. Hahn's declaration also violates Local Rule 7-5(b), which provides that declarations "may contain only facts" and "must avoid conclusions and argument." The Court has nonetheless considered Mr. Hahn's declaration in evaluating Defendant's motion for summary judgment, to the extent the declaration sets forth facts.

### C. Redacted Exhibits

The parties submitted exhibits that were redacted, sometimes in full, without submitting unredacted copies of the exhibits. The Court could not consider information which was redacted and not provided to the Court in unredacted form and thus the Court does not consider the redacted information to be part of the record.

### CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's motion for summary judgment on all of Plaintiffs' remaining claims.

This Order disposes of Docket No. 52.

**IT IS SO ORDERED.**

Dated: January 8, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge